### OTIS ELEVATOR CO. v. CITY OF GRAFTON, W. VA., et al.
### Civil Action No. 126–E.

District Court, N. D. West Virginia.
Aug. 1, 1947.

834

E. A. Bowers, of Elkins, W. Va., Ward Lanham, of Fairmont, W. Va., and Watson, Bristol, Johnson & Leavenworth, by Clair V. Johnson, all of New York City, for plaintiff.

D. H. Hill Arnold, of Elkins, W. Va., and Murray, Sackhoff & Paddack, by Walter F. Murray, all of Cincinnati, Ohio, for defendants.

BAKER, District Judge.

### Findings of Fact.

1. This is a suit filed October 1, 1945, under the United States Patent Laws for infringement of Linquist et al. patent 1,904,647, issued April 18, 1933, on an application filed May 21, 1925, entitled "Elevator System."

2. Plaintiff, Otis Elevator Company, is a corporation of New Jersey, and has an office and place of business in New York City, New York. It owns the patent in suit, and has owned it throughout the period since its issuance.

3. Defendant, the City of Grafton, is a municipal corporation of West Virginia, and has an office at Grafton, West Virginia,

within the Northern District of West Virginia.

4. Defendant, Warner Elevator Manufacturing Company, is a corporation of Ohio; is registered to do business in the State of West Virginia; has designated the State Auditor, Charleston, West Virginia, as its resident agent; and has a regular and established place of business within the Northern District of West Virginia. Under contract dated February 10, 1944, Warner sold, installed and serviced (i. e. keeps in running order) the automatic elevator used by Grafton at Grafton City Hospital; and Warner agreed with Grafton to defend it against claims of infringement and hold it harmless from loss on account thereof.

5. Under date of October 1, 1945, plaintiff gave written notice by registered mail to each defendant that the elevator at Grafton infringes the patent in suit. Defendant Warner had also known of said patent and of plaintiff's ownership thereof by reason of a proposed license thereunder, which Otis offered Warner in December 1938.

6. Defendant Warner alleges that it has been manufacturing elevators like the Grafton elevator since 1928 and that Otis had known of this since 1931. The record fails to substantiate such allegations, but to the contrary shows that the first knowledge Otis had was in 1938 when it sent two engineers to inspect a Warner installation in Cincinnati and at that time proffered the license to Warner.

7. During the years intervening between December 1938 and the filing of the complaint herein there were numerous conferences between the officers of Otis and Warner with respect to such a license. The proffered license was never returned and the matter was still open up to the time Warner representatives failed to attend a meeting scheduled thereon in New York September 15, 1945. When these representatives failed to appear as promised, plaintiff promptly brought suit for infringement.

8. The elevator system of the patent in suit has become known in the trade as a "selective collective automatic elevator" The elevator is "automatic" because the

car starts in response to the pressing of a button and stops automatically; it is "collective" because the car collects the calls, stopping in response to calls ahead of the car and returning automatically to collect calls behind the car; and it is "selective" because when the car is travelling in one direction collecting calls for that direction of travel it by-passes calls for the opposite direction of travel. The elevator system comprises an elevator car serving a plurality of floors, a motor for moving the car upwardly and downwardly, a brake for stopping the car, and a control system, in which calls are registered by the momentary pressing of push buttons, one in the car for each floor, and an Up hall push button and a Down hall push button at each intermediate floor, and a single hall push button at each terminal floor. If several push buttons in the car are pressed, the car is stopped successively at the floors for which such push buttons have been operated; if several hall buttons are pressed, the car, when travelling in the Up direction, is intercepted and stops successively at floors at which Up hall buttons have been operated and, when travelling in the Down direction, is intercepted and stops successively at floors at which Down hall buttons have been operated. Several Up hall calls as well as several Down hall calls may exist at the same time and the car will respond to all those for one direction before responding to those for the other direction, stopping successively at the floors in the natural order of floors regardless of the sequence in which the calls were registered and restarting automatically after each stop so long as calls which have been registered remain unresponded to. Each of the hall push buttons operates a floor relay to register a call, which for the intermediate floors corresponds to the direction of travel desired, and each of the car push buttons operates a floor relay to register a call for its corresponding floor. Each of the floor relays once operated is retained in operated condition to maintain the call registered until the call is answered, whereupon the relay is reset. The registering of a call in response to the first push button pressed initiates the starting of the car by causing the operation of switching mechanism for applying power to the motor. After the car is started it continues to move until mechanism controlled by car movement and responsive to the relay operated causes it to be intercepted at the floor for which the call is registered by discontinuing the power to the motor.

9. The patent disclosure is like a commercial installation made in 1925 by Otis in the Phelps Apartments, Cincinnati, Ohio, in which a bank of two selective collective automatic elevators were hitched up to one set of hall buttons. One feature of that installation was that one elevator operated alone until the traffic became too heavy and then the other one was automatically called into service and helped out until the load became normal again. The wiring diagram for the Phelps Apartments installation was introduced as Plaintiff's Exhibit 18. About the same time a single selective collective automatic elevator was installed by Otis in St. Luke's Hospital in Chicago, Illinois; the wiring diagram for this being introduced as Plaintiff's Exhibit 17. In filing their application for the patent in suit, Lindquist et al. described "the best known embodiment" (i. e. the Phelps Apartment installation) in detail but in so doing made it plain that they were not limiting themselves to a multiple car installation. This is clear not only because the patent contains claims to single as well as multiple car systems, but also because at the very beginning of the specification it says:

"One feature of the invention is to cause a push button controlled elevator car to stop automatically to pick up prospective passengers desiring to be carried in the direction in which the car is traveling." (P. 1, ls. 4-8)

At the end of the specification the patentees also make it clear that they are not limiting themselves to the exact details of apparatus shown and described:

"In accordance with the provisions of the patent statutes, the principle of operation of the invention, together with the apparatus now considered to represent the best embodiment thereof, have been described; but it is desired to have it understood that

the apparatus shown is only illustrative, and that the invention can be carried out by other means." (P. 31, 1s. 7-15)

Accordingly the patent is not limited to the exact details of the embodiment shown and described as illustrative. Defendants do not deny the fact that the disclosure of the patent in suit fully complies with 35 U.S.C.A. § 33, R.S. § 4888, which requires that an applicant for patent " * * * shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; * * * "

10. The patent in suit was duly issued after careful consideration of the prior art by the Primary Examiner in the Patent Office and, while defendants' Answer cited the same prior art, defendant has dropped the contention that the claims are anticipated thereby. Furthermore during its pendency the application for the patent in suit was also involved in extensive interference proceedings. The Examiner of Interferences had the power to consider the question of patentability (inter alia), and if he so desired, to reverse the Primary Examiner on this question. The Examiner of Interferences was in this sense a higher tribunal of the Patent Office. In said Interference proceedings the patentability of a number of the claims here in issue (i. e. Claims 4–6, and 76–83) were thus reaffirmed and redetermined by the Examiner of Interferences, who awarded priority of these claims to Lindquist et al. It is therefore clear that the Patent Office adjudged that Lindquist et al. complied with the other provisions of 35 U.S.C.A. § 33, R.S. § 4888, which require that an applicant for patent " * * * shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

11. It is specifically found that the patent in suit is in all respects in full and complete compliance with each and every requirement of 35 U.S.C.A. § 33, R.S. § 4888, both as to disclosure and claims.

12. Plaintiff here relies on Claims 4–6 inclusive, 9–14 inclusive, 23, 27, 28, and 76–84 inclusive of the patent in suit. The claims thus in issue are for patentable combinations of cooperating elements and circuits never before so associated for accomplishing the new selective collective automatic operation. Claim 11, for example, reads as follows:

"11. A control system for an elevator car comprising; a plurality of manually operable up switches, one at each of a plurality of floors; a plurality of manually operable down switches, one at each of said floors; means operable in response to each of said switches to register a call for the floor at which the switch is located; means responsive to the first call registered to initiate starting of the car; mechanism controlled by car movement and operable to intercept the car when moving upwardly at the floors for which up calls have been registered and when moving downwardly at the floors for which down calls have been registered, said starting means acting to initiate restarting of the car after each stop so long as calls which have been registered remain unresponded to; and means operable when each call is answered to cancel that call."

13. At the trial, plaintiff's witness Mr. Crabbe, an elevator engineer of over forty years' experience, explained certain descriptions, wiring diagrams and comparisons which he had made of the elevator system of the patent in suit and of the Warner elevator system at Grafton, copies of which were given to defendants five months prior to the trial. Neither the accuracy nor sufficiency of any of these has been questioned by defendants. In his Comparison of Warner and the Lindquist et al. patent in suit, Crabbe concisely pointed out the substantial identity of the two, as well as their minor differences:

"The Warner installation, like the elevator system of the Lindquist, et al., patent,

has an elevator car, a plurality of floors, a motor for moving the car in either direction, a brake for stopping the car, and a control system for the elevator car.

"Both systems have a plurality of car buttons in the car, one for each floor, and two hall buttons at each intermediate floor, one for passengers who wish to be carried in the up direction and the other for passengers who wish to be carried in the down direction. Both systems each have a single hall button at each terminal floor.

"In both systems when a button is pushed the registration of the call is accomplished by the operation of a floor relay which is maintained in operated condition enabling the push button to be released. In Warner, the floor relays are held in operated condition by self-holding circuits, while in Lindquist, et al., they are held in operated condition mechanically.

"In each system, the starting of the car in response to a call and its restarting after each stop when calls remain unresponded to is accomplished by switching mechanism which applies power to the motor and lifts the brake. Also, the car is stopped by discontinuing the application of power to the motor and applying the brake. Each system includes a time delay mechanism to delay the automatic restarting for a predetermined time.

"In each system after the car is started it continues to move until mechanism controlled by car movement causes the car to be stopped at the floor for which a call is registered and the operated floor relay to be reset. This mechanism in each system comprises a plurality of stationary contacts which are engaged by brushes moved in accordance with car movement, but at a reduced ratio.

"In each system the pressing of an up hall button or a down hall button for any floor other than that at which the car is positioned starts the car. If several buttons are pressed, the calls are registered and the car is stopped at all floors at which hall buttons corresponding to the direction of car travel have been pressed, restarting automatically, the stops being made in the order in which the floors are reached regardless of the sequence in which the buttons are pressed provided each button is pressed in sufficient advance to permit the stop to be made.

"In both systems the registration of calls both above and below the car causes the car to remain in continuous operation, successively stopping in response to up hall calls registered ahead of the car when the car is travelling in the up direction and to down hall calls registered ahead of the car when the car is travelling in the down direction and automatically restarting until they have all been answered, and also responding to any calls which may have been registered by any passenger entering the car until all these calls have also been satisfied.

"In each system, when the direction of car travel is established, all hall calls for that direction for floors ahead of the car will be answered before hall calls for that direction for floors behind the car or hall calls for the opposite direction will be answered, and the car is not reversed until after the farthest call has been answered.

"In the Lindquist, et al., system, the car travels to and is automatically reversed at the terminals. In the Warner system, the car travels in one direction until the farthest call in that direction from the car is answered, and when this farthest call is answered, the car may be reversed without going to the terminal floor.

"In the Warner system, if the farthest call is for the direction opposite to that of car travel, the car will stop at that floor, whereas in the Lindquist, et al., system, the car will proceed to the terminal and reverse and then stop at that floor.

"In both the Warner and Lindquist, et al., systems when a car is travelling in one direction in response to a registered call, the operation of a hall button on an intermediate floor for the opposite direction is not effective to stop the car as it passes but causes it to return later in the other direction to answer the call thus registered. However, the car will be intercepted at intermediate floors where hall buttons for the direction in which the car is travelling have been pressed."

■ 14. There is no item in the prior art which either anticipates or necessitates importing limitations into the claims in is-

sue to save their validity. Defendants at the trial produced no testimony in denial of the fact that the claims in issue read squarely on the Warner installation at Grafton. It is in Defendants' Brief that for the first time they argue that the patent in suit should be limited to an elevator employing reversal at the terminals as shown in the specific embodiment used by Lindquist et al. to illustrate their invention, whereas the Grafton elevator car may be reversed at an intermediate floor if that is the farthest call. Similar argument was raised by defendants in the Staley case, which was a prior litigation involving the patent in suit, namely Otis Elevator Co. v. 570 Building Corporation et al., 2 Cir., 98 F.2d 699, certiorari denied 305 U. S. 673, 59 S.Ct. 228, 83 L.Ed. 430, but it was there held that this was a matter of detail and was not substantial nor significant to the question of infringement. Here also defendants' argument is without merit and furthermore, it is based on an attempted misconstruction of Mr. Crabbe's testimony. The claims relied on do not specify reversal at the terminals, and are thus broader in scope than other claims not in issue (e. g. Claims 26 and 29 which do specifically contain this limitation). There is no reason to import such limitation into the claims relied on, and the plain and simple fact is that the Grafton elevator comes plainly within the valid scope of the Claims here relied on, namely, Claims 4–6, inclusive, 9–14 inclusive, 23, 27, 28 and 76–84 inclusive, which are valid and infringed.

15. Similarly unpersuasive is defendants' argument that Claims 1 and 3 of the patent in suit are invalid because (defendants allege) they are the same in substance as Claims 1 and 2 of Larson patent 1,694,823, and should have been disclaimed. This argument is based only on the testimony of defendants' witness Mr. Kaiser, who began work many years ago as a patent draftsman and eventually became a patent solicitor. He was scarcely qualified to express the opinion that he did, and to reach it he had to disregard language in the Lindquist et al. claims which clearly distinquish them from the claims of Larson. A similar argument was raised by the defendants in the Staley case and the Court refused to accept it. The applications of the Lindquist et al. patent in suit and of the Larson patent were copending with each other, and a clear line of division was maintained between the claims of the applications. Therefore, here also the defendants' argument is not acceptable, and inasmuch as the claims relied on, as well as Claims 1 and 3, are valid, no reason has been shown why a disclaimer should have been or should be filed.

16. The patent in suit has filled a long felt need in the art and has had marked commercial success. Otis has been in the elevator business since about 1853, and despite its expenditure of large sums of money for development and research, it has never been able to develop an automatic elevator system for apartment house use which is better than selective collective automatic operation. Up to the date of the Staley trial (May, 1937) Otis had sold 1600 selective collective automatic elevators having a value of approximately $13,000,000; and from that time up to October 1, 1946, it had sold an additional 3500 such elevators having a total sales value of about $32,000,000.

17. Otis now has over twenty licensees under the patent in suit. A typical license was introduced in evidence as Plaintiff's Exhibit 22, and it does not support defendants' allegation (which defendants have since dropped) that plaintiff enters this court with unclean hands. Up to October 1, 1946, these licensees reported sales of over 1800 licensed elevators with an aggregate selling price of over $16,000,000.

18. This total of around 7,000 selective collective automatic elevators having a total value of more than $60,000,000, made under the patent in suit, and the imitation and unauthorized appropriation of the invention by defendant Warner is cogent evidence of the novelty and utility of the patented invention.

### Conclusions of Law.

1. This court has jurisdiction of the parties and of the cause of action.

2. Plaintiff has good title to the Lindquist, et al., patent in suit 1,904,647, and has had same since the issuance of the patent.

3. The patent in suit is good and valid as to the claims thereof in issue, these

being Claims 1 and 3 put in issue by defendants, and Claims 4–6, inclusive, 9–14 inclusive, 23, 27, 28 and 76–84 inclusive relied on by plaintiff as infringed.

4. Each of the claims relied on, namely, Claims 4–6 inclusive, 9-14 inclusive, 23, 27, 28 and 76–84 inclusive, has been infringed by the defendants and each of them.

5. Plaintiff has not been guilty of laches or of unclean hands, and there has been and is no reason for plaintiff to file a disclaimer in respect to the patent in suit.

6. Plaintiff is entitled to a permanent injunction against infringement by defendants, particularly against infringement by defendant Warner, which has indemnified defendant Grafton.

7. The plaintiff is also entitled to recover from defendant Warner general damages to be later determined by appropriate proceedings herein, but to consist of not less than a reasonable royalty for Warner's making, using, and selling the invention from the date of October 1, 1939.

8. That Warner's infringement of the patent in suit was deliberate.

9. Plaintiff is also entitled to recover its costs to be determined later by the court.